*In re* ADOLFO PORRATA DORIA, querellado.

Núm. 79.—*Sometido:* Mayo 6, 1952. *Resuelto:* Septiembre 15, 1952.

*Félix Ochoteco, Jr.* y *Benicio Sánchez Castaño*, abogados del querellado; *J. Rivera Barreras, Fiscal del Tribunal Supremo*, abogado de El Pueblo.

*Per Curiam:* Con fecha 5 de julio de 1949 dictamos sentencia en el caso de *Rivera* v. *Sucn. Díaz Luzunaris* confirmando la dictada por el extinto Tribunal de Distrito de San Juan. 70 D.P.R. 181. De conformidad con lo indicado en la nota 11 de la opinión que en apoyo de la misma emitimos, (1) el mismo día ordenamos al fiscal de este Tribunal que procediera a practicar una investigación con respecto a la conducta profesional del abogado Adolfo Porrata Doria. Rendido en 20 de febrero de 1950 el informe correspondiente, el 7 de marzo siguiente ordenamos a dicho funcionario que dentro del término de 30 días radicara querella de *disbarment* contra ese abogado. En la presentada de conformidad con lo ordenado, el fiscal imputa al querellado siete cargos que, sintetizados, rezan así:

*Primero:* Que Ramón Pastor Díaz Molinary falleció el 4 de noviembre de 1939 dejando un capital calculado en la suma de $600,000 y como únicos y universales herederos a su hijo legítimo Ignacio Díaz Luzunaris, a su hijo natural reconocido Ramón Díaz Rivera y a su viuda Eustacia Luciano Maldonado; que Díaz Rivera fué declarado hijo natural reconocido de Díaz Molinary por sentencia firme de la Corte de Distrito de Guayama, con todos los derechos inherentes a ese estado; que habiendo sido calculados los bienes relictos en la suma de $600,000 Díaz Rivera tenía derecho a la porción que le asigna la ley en la herencia de su padre; que Díaz Rivera desde temprana edad era un incapacitado mental que padecía de oligofrenia, no era persona que pudiera entender el alcance de una transacción, por ser un morón, un débil mental; y que Po-

_____

(1) Véase la página 198 de la opinión.

rrata Doria, quien fué su abogado en el caso de filiación, no obstante conocer los anteriores hechos autorizó el 28 de febrero de 1940 una escritura a virtud de la cual Ramón Díaz Rivera cedió y traspasó a favor de Ignacio Díaz Luzunaris sus derechos hereditarios en la herencia de su padre por la suma de $10,000, lo que constituía una causa irrisoria y extremadamente inadecuada, que convertía en inexistente el contrato de transacción por falta de capacidad legal en Díaz Rivera para consentir.

*Segundo:* Que Porrata Doria ejerció indebida influencia sobre el referido incapaz con el fin de beneficiar a Ignacio Díaz Luzunaris, al recomendarle a Díaz Rivera que aceptara una transacción por la suma de $10,000, no obstante haber Porrata Doria reconocido que no debía transigir los derechos hereditarios de Díaz Rivera por menos de $25,000.

*Tercero:* Que en la escritura de transacción se hizo constar por Porrata Doria que en el acto del otorgamiento de la misma se entregaba a Díaz Rivera un cheque certificado por $10,000 expedido a favor de éste, siendo ese hecho falso y teniendo conocimiento de ello Porrata Doria.

*Cuarto:* Que en la vista del caso de filiación Porrata Doria faltó a sus deberes como funcionario del Tribunal de Distrito de Guayama al no informar a éste la verdadera situación legal, en el sentido de que existía un convenio celebrado previamente entre los litigantes por el cual habían llegado a una transacción.

*Quinto:* Que en 14 de noviembre de 1939 se firmó un contrato de servicios profesionales, figurando de una parte Ramón Díaz Rivera y su señora madre y de la otra Porrata Doria, Juan Ramírez Viñas y Manuel Carrasquillo Herpén, en el que se hizo constar como cláusula segunda que las partes convenían y estipulaban expresamente que ni una ni otra podrían hacer convenio o transacción alguna extrajudicial sin la conformidad y consentimiento de la otra parte, y a pesar de ello Porrata Doria en 19 de enero de 1940 preparó un documento de "Convenio de Transacción" para ser firmado única-

mente por Ramón Díaz Rivera e Ignacio Díaz Luzunaris y el mismo fué firmado por las partes sin que de ello tuviera conocimiento la señora Josefa Rivera.

*Sexto:* Que en el documento de "Convenio de Transacción",—por el cual se comprometieron tanto Díaz Rivera como ·Díaz Luzunaris—Porrata Doria no obtuvo la firma de este último en la copia que retuvo y permitió que el original se lo llevara el Lic. Agustín E. Font, abogado de Díaz Luzunaris, a pesar de que en ese documento se hizo constar que "estando conforme con lo aquí transcrito, el Sr. Ignacio Díaz Luzunaris firma y expresa su conformidad a lo aquí indicado"; y que al así actuar Porrata Doria perjudicó los derechos de su cliente Díaz Rivera y benefició a Díaz Luzunaris, toda vez que éste quedaba en libertad de cumplir o no dicho convenio y obligado por el mismo únicamente Díaz Rivera.

*Séptimo:* Que a pesar de haber firmado el referido "Convenio de Transacción" por la suma de $10,000 Porrata Doria informó el 28 de febrero de 1940—fecha de la vista del caso de filiación—al Lic. Juan Ramírez Viñas, quien también figuraba como abogado de Díaz Rivera, que se le había ofrecido una transacción por la suma de $7,500, cantidad que se negó a aceptar dicho abogado. Termina la querella alegando que los hechos imputados al querellado constituyen conducta inmoral, censurable e impropia y de carácter grave, así como serios incumplimientos de sus deberes como abogado y notario; y suplicando que previos los trámites de ley este Tribunal proceda a separar a Porrata Doria en el ejercicio de su profesión de abogado y notario.

Contestó el querellado aceptando el fallecimiento de Ramón Pastor Díaz, negando que éste dejara bienes calculados en la suma de $600,000 y alegando en contrario que el valor de tales bienes después de un minucioso inventario y valoración ascendió a alrededor de $290,664.44 de los cuales había deducciones montantes a $62,504.82, lo que dejaba un caudal líquido a repartir entre sus herederos de $228,159.62; que el hijo natural reconocido Ramón Díaz Rivera tenía derecho a

una sexta parte de esa suma; y que él nunca tuvo conocimiento, ni siquiera pudo sospechar que Díaz Rivera desde temprana edad fuera un incapaz mental y padeciera de oligofrenia. Sostuvo que él en momento alguno indujo o hizo presión alguna para que Díaz Rivera cediera y traspasara a dicho Ignacio Díaz Luzunaris sus derechos hereditarios por la suma de $10,000; que ése fué el deseo de Díaz Rivera después de haberse impedido al propio Díaz Rivera efectuar una transacción por una cantidad inferior; y que aun cuando él— el querellado—hizo todo lo posible para conseguir una cantidad superior a $10,000, no considera irrisoria ni en extremo inadecuada esa suma si se toma en consideración las circunstancias y naturalezas del caso, o sea: que el de filiación ya había sido archivado por la Corte de Distrito de Guayama; que este Tribunal al revocar la sentencia de filiación dictada por dicha corte daba a entender que la prueba no era suficiente; que había pleitos pendientes ante la Corte de Distrito de Guayama contra Pastor Díaz por una suma considerable; que casi todos los testigos que declararon originalmente en el caso de filiación habían muerto o se desconocía su paradero; que la declaración de la propia Josefa Rivera, madre del demandante, era muy dudosa y estaba llena de contradicciones; y que dicha suma fué entregada a Díaz Rivera sin que éste respondiera de obligación alguna en relación con los bienes del caudal relicto y estuvo exenta del pago de contribución de herencia.

Negó también el querellado que él ejerciera indebida influencia sobre Díaz Rivera o que actuara con el propósito de beneficiar a Ignacio Díaz Luzunaris ni de perjudicar a su cliente. Alegó que el certificado entregado a Díaz Rivera por la suma de $10,000 aparece debidamente identificado en la escritura otorgada y que el mismo fué cobrado en su totalidad por aquél, quien pagó a sus abogados la suma de $5,000, depositó en el Banco Crédito y Ahorro Ponceño, Sucursal de Guayama, la suma de $4,500 y se reservó en su poder $500 en efectivo; que las partes y sus abogados tuvieron una entre-

vista con el juez de la Corte de Distrito de Guayama, en la oficina de éste, y dicho juez fué enterado de lo ocurrido hasta aquel entonces; que la señora Josefa Rivera estaba presente cuando se hizo el convenio de transacción el 19 de enero de 1940 y expresó su conformidad al mismo; que dicho convenio fué firmado en su original y varias copias tanto por Ignacio Luzunaris como por Ramón Díaz Rivera y que él retuvo en su poder algunas de las copias firmadas por ambos; que en todo momento mantuvo informado a sus compañeros Carrasquillo Herpén y Ramírez Viñas de cuanto paso y actuación él dió en el mismo y de todas las proposiciones de transacción que recibiera.

Considerando que en el presente caso era necesario examinar numerosos testigos, el 21 de noviembre de 1950 este Tribunal nombró al Lic. Enrique Córdova Díaz para que en presencia de ambas partes y en su calidad de *Master* oyera y recibiera la prueba que éstas pudieran presentarle, debiendo los testigos declarar bajo juramento. También dispusimos en la resolución dictada que si alguna prueba era objetada la misma sería admitida, pero haciéndose constar los fundamentos de la objeción, y que una vez que toda la prueba fuera practicada sería el deber del *Master* certificarla inmediatamente y remitirla al Tribunal con sus conclusiones de hechos.

Aceptada por el Lic. Córdova Díaz la designación que se le hizo, procedió a oír y recibir la prueba que le ofrecieron las partes. Trece vistas celebró, aduciendo ambas partes, según hace constar en su informe, "extensa prueba documental y testifical", la que junto con su informe nos ha sido elevada. En ese informe, después de especificar los siete cargos de la querella y de hacer constar las alegaciones aducidas por el querellado en su contestación, nos dice el *Master* que las cuestiones principales en controversia pueden ser consideradas bajo los siguientes puntos:

"1) Valor de la herencia de Ramón Pastor Díaz en o alrededor de la fecha de la transacción convenida en 19 de enero de 1940.

"2) Participación legal de Ramón Díaz Rivera como hijo natural en la herencia de Ramón Pastor Díaz.

"3) La incapacidad de Ramón Díaz Rivera y el conocimiento del querellado de su condición mental para la fecha de la transacción.

"4) Razonabilidad de la transacción.

"5) Indebida influencia por parte del querellado para que Ramón Díaz Rivera aceptara la transacción y el haberse prescindido de Josefa Rivera, señora madre de Ramón Díaz Rivera, en el convenio de transacción de 19 de enero de 1940.

"6) El haberse consignado en la escritura de transacción de 28 de febrero de 1940 que se le entregó a Ramón Díaz Rivera un cheque certificado por la suma de $10,000 en vez de un certificado de depósito por la misma suma de $10,000.

"7) La omisión del querellado de informarle al Tribunal de Distrito de Guayama sobre la transacción acordada y firmada en 19 de enero de 1940 al celebrarse el juicio sobre filiación en 28 de febrero de 1940.

"8) El no haberse obtenido la firma de las partes en la copia del contrato de transacción de 19 de enero de 1940 que retuvo el querellado como abogado de Ramón Díaz Rivera.

"9) El haber informado el querellado a su abogado asociado Ramírez Viñas el día de la vista—28 de febrero de 1940—en el caso de filiación, que existía una oferta de transacción de $7,500 cuando ya se había firmado el convenio de transacción de 19 de enero de 1940 por la suma de $10,000.

"10) Reputación profesional del querellado."

Inmediatamente el *Master* pasa a discutir esos puntos uno por uno. En relación con el primero indica que en su opinión el verdadero valor en el mercado de los bienes inmuebles dejados por Pastor Díaz era en el año 1940 aproximadamente $325,000, habiendo dado consideración para llegar a esa conclusión, al valor de los arrendamientos de las fincas arrendadas por un término de 10 años a Wirshing & Cía., capitalizando las rentas de acuerdo con la declaración del Contador Público Julio Santiago García; que creía razonable dar a los demás bienes un valor de $30,000 siendo, por tanto, su conclusión que el valor de todos los bienes relictos era de aproximadamente $355,000; que descontando un pasivo de $25,000,

más una partida de $10,000 para cumplir las contingencias de unos pleitos pendientes ello daba un resultado neto de aproximadamente $315,000 (sic) ; que consideraba que los gananciales de la viuda, quien se casó con el causante como 3 años antes de su muerte, ascendían a $40,000, o sea no más de $20,000 para la viuda; y que su conclusión era que el haber hereditario de Ramón Pastor Díaz, después de descontado el pasivo y los gananciales estimado tenía un valor para el año 1940 de aproximadamente $295,000. Continúa manifestando el *Master* en su informe que "nuestra opinión es que el valor neto de la herencia distribuíble era aproximadamente $295,000. No podemos exigirle al querellado al considerar su conducta profesional en este caso que él llegara a esta misma conclusión, pero dándole el mayor beneficio de la duda a la luz de los hechos que él conocía o que estaban a su alcance, y considerando su propia conclusión de que lo razonable era transigir por $25,000, no creemos que él pudiera razonablemente pensar que dicha herencia tuviera un valor neto menor de alrededor de $230,000. Además, hemos ya visto que en su contestación el propio querellado alega que el valor neto de la herencia era de $228,159.62."

En relación con la participación legal de Ramón Díaz Rivera como hijo natural en la herencia de Ramón Pastor Díaz (Punto número 2) dice el *Master* en su informe que el querellado declaró que siempre consideró y aún considera que a su cliente Ramón Díaz Rivera le correspondía por ley como hijo natural una sexta parte de la herencia; que el querellado basaba su conclusión en lo dispuesto por el artículo 767 del Código Civil, ed. 1930, al efecto de que un hijo natural tiene derecho a la mitad de lo que le corresponde a un hijo legítimo no mejorado y consideraba que habiéndose asignado por el testador el tercio de mejora al único hijo legítimo la participación de su cliente como hijo natural tenía que ser la mitad de la legítima estricta, o sea la mitad de una tercera parte.

Continúa manifestando el *Master* que la participación que correspondía al hijo natural era en este caso una de las cues-

tiones legales más importantes que tenía que estudiar y decidir el querellado en representación de su cliente y que como abogado del hijo natural el querellado tenía el deber de buscar la interpretación más favorable a su cliente. Después de hacer un estudio de esa cuestión legal el *Master* concluye que "el querellado de haber hecho un estudio cuidadoso de este aspecto legal tan importante para determinar los derechos de su cliente debió haber llegado a la conclusión, por lo menos, de que existía una base razonable de acuerdo con la ley y la jurisprudencia para sostener que a su representado le correspondía una tercera parte de la herencia. Al no hacerlo así perjudicó indudablemente las oportunidades de su cliente de obtener una suma mayor en la transacción. Sin embargo, no podemos decir que esta actuación de él fué intencional con el fin de perjudicar a su cliente."

Sobre el tercer punto, o sea la incapacidad de Ramón Díaz Rivera y el conocimiento del querellado de su condición mental para la fecha de la transacción, el *Master* indica que entiende hay dos cuestiones fundamentales para ser determinadas: (1) si para la fecha de la transacción Ramón Díaz Rivera estaba incapacitado mentalmente para formar juicio sobre la misma; y (2)—que a su juicio es la más importante —si el querellado sabía o debió haber sabido que existía una incapacidad mental de parte de su cliente. Procede entonces a estudiar la evidencia que tuvo ante sí y como resultado de toda ella llega a la conclusión de que "para la fecha en que se llevó a efecto la transacción en este caso o sea en 19 de enero de 1940 el querellado era un débil mental o un morón y . . . no tenía capacidad suficiente para apreciar y formar un juicio razonable sobre los méritos de la transacción que se llevó a efecto en este caso" y que "el querellado pudo haber sabido de esta limitada capacidad mental de su cliente en una de tres formas: (1) por referencia, es decir, que alguien lo hubiese enterado de la misma; (2) que el verdadero estado mental de Ramón Díaz Rivera fuera aparente para cualquier persona que hubiese tenido trato con él; o (3) de actos de su cliente

indicativos de esa condición." Sigue diciendo el *Master* que "existe una evidencia incontrovertida que aun cuando no es suficiente para demostrar que el querellado sabía que su cliente estaba incapacitado mentalmente sí le indicaba que estaba tratando con un cliente de limitada inteligencia. Nos referimos al convenio sobre servicios profesionales firmado en 14 de noviembre de 1939 donde aparece de una parte Ramón Díaz Rivera y su señora madre Josefa Rivera y de otra parte los abogados Ramírez Viñas, Manuel Carrasquillo y el querellado. . . . Ya para el 14 de noviembre de 1939 Ramón Díaz Rivera era mayor de edad y esto le constaba al querellado. La comparecencia de la señora madre en este documento no obstante tratarse de un cliente mayor de edad indica que las partes en ese documento estaban conscientes que Ramón Díaz Rivera no podía por lo menos actuar inteligentemente en protección de sus intereses en el asunto de la herencia de su señor padre y que era necesario o conveniente que fuera asesorado por un familiar inmediato (en este caso su señora madre). Existe otro dato que no fué controvertido que debe tomarse en consideración al llegar a una conclusión sobre lo que sabía o debió haber sabido el querellado en relación con la capacidad mental de su cliente. El querellado declaró que algunos días antes de realizarse la transacción de 19 de enero de 1940 su cliente sin el consentimiento del querellado y aparentemente acompañado y asesorado de un tal Rafael Cividanes fué a Mayagüez y quiso hacer una transacción por $8,000 y un automóvil y que si no es por la intervención del Lic. Agustín Font, abogado de Ignacio Díaz, quien lo llamó por teléfono y le avisó de la visita quizás se hubiese acordado dicha transacción. . . . . Según el querellado después de esta visita su cliente insistía en terminar el caso y que se aceptara la transacción de $10,000. . . . Esta actuación de Ramón Díaz Rivera tenía que ser otro indicio para el querellado de que no estaba tratando con un cliente de una inteligencia normal." Luego indica que "nos queda por considerar si la debilidad mental de la cual padecía Ramón Díaz Rivera en 1940 era o debía ser

aparente para cualquier persona que tratara asuntos o negocios con él" y continúa la discusión de ese punto diciendo que "el querellado no sabía ni razonablemente debía haber sabido que estaba tratando con un incapacitado mental o con un cliente que padecía de oligofrenia; el querellado, sin embargo, sabía que su cliente Ramón Díaz Rivera tenía una inteligencia limitada y que era deseable que en decisiones de asuntos de importancia tuviera la asistencia y consejo de familiares o personas de su confianza y especialmente de su señora madre."

En cuanto a la razonabilidad de la transacción el *Master* manifiesta que el querellado declaró extensamente sobre las razones que lo llevaron a aprobarla, a saber: (1) duda sobre el resultado final del pleito de filiación, base esencial para tener derecho a participar en la herencia; (2) ciertos pleitos pendientes y otras obligaciones que fueron asumidas por Ignacio Díaz Luzunaris; y (3) la insistencia de Ramón Díaz Rivera en transigir por los $10,000. Luego indica que "analizada toda esta situación y considerando que para el año 1940 ya se había resuelto el caso de *Colón* v. *Tristani*, 44 D.P.R. 171, liberalizando la regla sobre la evidencia necesaria para casos de filiación, y tomando especialmente en cuenta el proceso judicial contra Pastor Díaz que resultó en su convicción por haber tratado de establecer por escritura pública fraudulenta que un tercero era el padre de Ramón Díaz Rivera, prueba que era admisible en el segundo juicio, creemos que el querellado podía razonablemente pensar que las probabilidades de éxito estaban a su favor en el caso de filiación. Sin embargo, es quizás más fácil analizar esta situación ahora retrospectivamente y en vista de lo sucedido. Tenemos que aceptar que un pleito nunca está seguro, y que en el que discutimos había base para pensar en una posible, aunque no probable, sentencia adversa. El querellado estaba justificado por tanto, en ceder algo de los derechos de su cliente tomando esta contingencia en consideración y así eliminar toda posibilidad de que la reclamación quedara reducida a cero." Manifiesta, además, el *Master* que "creemos que ciertamente Ra-

món Díaz Rivera insistió en que se hiciera la transacción por los $10,000 y que esa insistencia contribuyó a la decisión del querellado de aceptar la transacción" y que "estudiadas todas las circunstancias presentes cuando el querellado tuvo que decidir si aceptar la transacción por $10,000 o no, llegamos a la conclusión que la transacción dista mucho de ser razonable y aunque no diríamos que la consideración fué irrisoria sí la calificaríamos de claramente inadecuada. El mismo querellado consideraba la suma razonable en transacción en $25,000 y no $10,000. Era razonable aceptar en transacción algo menos del todo (digamos de un 20 por ciento a un máximum de un 40 por ciento menos) pero en las circunstancias es imposible, por más beneficio de la duda que se le quiera dar al querellado, concluir que Ramón Díaz Rivera recibió una suma razonable en transacción especialmente si tomamos en cuenta que la mitad de los $10,000 eran para honorarios de abogados. La insistencia de Ramón Díaz Rivera de transigir por los $10,000 no justificaba que el querellado aceptara la transacción. Él no sabía que su cliente estaba mentalmente incapacitado para consentir pero sí sabía, o debió haber sabido, que Ramón Díaz Rivera no era un hombre de mucha inteligencia y que no podía aquilatar con buen juicio los méritos de la transacción en un asunto tan complicado para una mente lega sin experiencia en negocios de tantos miles de dólares."

En relación con el punto quinto, o sea indebida influencia por parte del querellado para que Ramón Díaz Rivera aceptara la transacción y el haberse prescindido de Josefa Rivera, señora madre de Ramón Díaz Rivera, en el convenio de transacción de 19 de enero de 1940, el *Master* se expresa en su informe así:

"No se presentó prueba directa de que el querellado ejercitara indebida influencia afirmativa sobre la persona de su cliente Ramón Díaz Rivera para que aceptara la transacción. No hay nada en el récord que nos permita concluir que el querellado in-

sistiera con Ramón Díaz Rivera para que aprobara la transacción o que tratara de convencerle de la razonabilidad de la misma.

"Lo más que puede decirse es que el querellado dejó de tomar acción enérgica afirmativa para disuadir a su cliente Ramón Díaz Rivera de que aceptara la transacción.

"No hay duda alguna de que Ramón Díaz Rivera estaba en esos momentos ansioso de terminar el caso y cobrar su participación y este factor como hemos visto tuvo que necesariamente influir en la decisión final del querellado de darle paso a la transacción por $10,000.

"El querellado, sin embargo, como abogado de Ramón Díaz Rivera y sabiendo que estaba tratando con una persona de limitaciones intelectuales y con poco conocimiento de negocios de esta naturaleza no podía descargar su responsabilidad en cuanto a la aprobación de la transacción tomando la posición de que la decisión fué dictada por su cliente y no por él. El querellado debió, además, en las circunstancias de este caso, haberle dado participación en la decisión a la señora madre Josefa Rivera antes de llegarse a una conclusión final.

"Hemos llegado a la conclusión de que Josefa Rivera no estaba presente cuando se firmó el contrato de transacción en este caso y que no supo de la transacción hasta el 28 de febrero de 1940 cuando se celebró el juicio sobre la filiación de su hijo y se otorgó la escritura de transacción pagándose el importe de la misma.

"Tomando en consideración que la señora madre Josefa Rivera firmó con su hijo ya mayor de edad el contrato de servicios profesionales y que se había trasladado de Santurce a Guayama para estar con su hijo mientras se llegaba a un acuerdo o se seguía con el juicio de filiación el querellado debió haberle notificado de la transacción por $10,000 antes de aprobarse la misma. Un abogado, desde luego, no tiene que consultar con los familiares inmediatos de su cliente cuando su cliente es mayor de edad y tiene plena capacidad mental antes de aceptar una transacción con la cual el cliente está conforme, pero las circunstancias del presente caso lo sacan de la regla general.

"No existe prueba que justifique la conclusión de que el querellado aprobó la transacción con el propósito de perjudicar a su cliente y beneficiar a Ignacio Díaz, la parte contraria."

Sobre el haberse consignado en la escritura de transacción de 28 de febrero de 1940 que se le entregó a Ramón Díaz Ri-

vera un cheque certificado por la suma de $10,000 en vez de un certificado de depósito por la suma de $10,000, manifiesta el *Master* que "este cargo carece de importancia, ya que se trata mayormente de un error en nomenclatura y no de una cuestión substancial", y expone ampliamente los motivos que le hacen llegar a tal conclusión.

Respecto al punto séptimo, es decir, sobre la omisión del querellado de informarle al Tribunal de Distrito de Guayama sobre la transacción acordada y firmada en 19 de enero de 1940 al celebrarse el juicio sobre filiación en 28 de febrero de 1940 siguiente, informa que "el querellado y el abogado de la parte demandada, formalizada ya la transacción de 19 de enero de 1940, deseaban poner en vigor el convenio logrando que se dictara sentencia declarando que Ramón Díaz Rivera era hijo natural reconocido de Ramón Pastor Díaz. Para ello tenían las siguientes alternativas: (1) Informarle al tribunal francamente que había habido una transacción y que la parte demandada admitía los hechos de la demanda y no habría de presentar prueba en contrario; (2) Sin mencionar la transacción (a menos que el tribunal hiciera alguna pregunta sobre ese respecto) informarle que el demandado aceptaba los hechos de la demanda y que no habría de presentar prueba en contrario; y (3) Dar la impresión de que las partes estaban aún en controversia sobre el hecho de filiación e ir a juicio sobre esa base."

Entiende el *Master* que en el presente caso los abogados escogieron un camino que está más bien entre la segunda y tercera alternativa: "No le informaron al Tribunal de la transacción ni tampoco le hicieron saber expresamente que la parte demandada aceptaba los hechos de la demanda y que no habría de presentar prueba en contrario. Sin embargo, no trataron de simular en el juicio una controversia genuina entre las partes sino que lo condujeron en tal forma que tenía que ser aparente para el tribunal que la parte demandada no tenía objeción a que se dictara sentencia favorable a la parte demandante en el caso. Después de comenzado el juicio y en

vista de que el abogado de la parte demandada no repregun- taba, el Juez inquirió si el caso se estaba viendo en rebeldía, explicando el querellado que aunque no había contestación ra- dicada no se había anotado la rebeldía, sin hacerse ninguna otra explicación." Entiende el *Master* que "hubiese sido me- jor práctica por parte de los abogados de ambas partes haber optado por una de las dos primeras alternativas. Sin em- bargo, no llegaron al extremo de engañar al tribunal y más bien por la forma en que actuaron, implícitamente le dejaron saber que no había objeción alguna de la parte demandada a que se dictara sentencia favorable en este caso."

El querellado admite, según el *Master*, que la copia del convenio de transacción de 19 de enero de 1940 que él retuvo en su poder no tenía la firma de Ignacio Díaz Luzunaris, aunque insinuó la posibilidad de que existieran copias firma- das por éste. El original del convenio fué retenido por el Lic. Font, abogado de Ignacio Díaz Luzunaris y aparente- mente estaba debidamente firmado por ambas partes. Dice entonces el *Master* que "lo más que podríamos decir es que el querellado debió haber retenido una copia firmada del conve- nio, pero no creemos que al dejar de así hacerlo incurrió en una conducta impropia dentro del marco de las obligaciones de un abogado para con su cliente. El querellado aparente- mente tenía tanta confianza en el compañero Lic. Agustín Font, abogado de la parte contraria, que no tuvo inconve- niente en dejar el original del contrato en su posesión bajo la seguridad de que jamás habría de negar la existencia de dicho contrato."

En cuanto a haber informado el querellado a su abogado asociado Ramírez Viñas—el día de la vista 28 de febrero de 1940—en el caso de filiación que existía una oferta de trans- acción de $7,500 cuando ya se había firmado el convenio de transacción de 19 de enero de 1940 por la suma de $10,000, manifiesta el *Master* que "el querellado admite que el mismo día de celebrarse la vista del caso de filiación . . . le dijo al Lic. Ramírez Viñas que le ofrecían $7,500 como transacción;

explicó que no tenía por qué ocultarle a Ramírez Viñas la transacción por $10,000 ya acordada y firmada en 19 de enero de 1940 y que posiblemente se trataba de una broma y que Carrasquillo ya sabía de la transacción." El *Master* hace entonces un resumen de la prueba ofrecida por las partes sobre este punto e indica que "de este resumen de la prueba resulta claramente que por razones que no surgen de la prueba el querellado no informó hasta el último momento a sus compañeros asociados en el caso, Lic. Carrasquillo y Lic. Ramírez Viñas, la existencia del contrato de transacción de 19 de enero de 1940. El querellado fué aún más lejos para que sus compañeros no quedaran enterados de la existencia de dicho convenio de transacción, ya que en 28 de febrero de 1940 y momentos antes de la vista en el caso de filiación tuvo una conversación con el Lic. Ramírez Viñas sobre la base de que no había habido transacción acordada entre las partes y que lo más que había era una oferta de $7,500. No fué hasta que el Lic. Ramírez Viñas se negó a dar su consentimiento a la transacción por $7,500 que el querellado luego de hablar con el Lic. Font le comunicó que podía ser transigido por $10,000, estando conforme entonces el Lic. Ramírez Viñas. El Lic. Ramírez Viñas por lo tanto tenía que pensar y pensó que la transacción se estaba realizando allí y entonces y no que había sido acordada más de un mes antes mediante documento firmado por las partes con el conocimiento del querellado y el Lic. Font, abogado de la parte contraria. Si el querellado hubiese enviado notificación escrita al Lic. Carrasquillo del convenio de transacción el mismo día—19 de enero de 1940— sería inexplicable su conversación con el Lic. Ramírez Viñas en 28 de febrero de 1940 sobre una oferta de transacción por $7,500 y luego la aceptación por $10,000 ya que debía suponer que el Lic. Carrasquillo le hubiese informado al Lic. Ramírez Viñas de la transacción por $10,000. Recuérdese que el Lic. Ramírez Viñas y el Lic. Carrasquillo vivían en Río Piedras y que el querellado se comunicaba principalmente con el Lic.

Carrasquillo y éste le informaba al Lic. Ramírez Viñas. Concluímos que el querellado faltó a sus obligaciones como abogado e incurrió en conducta claramente impropia de un abogado al no informar la existencia del convenio de transacción de 19 de enero de 1940 a sus compañeros asociados Lics. Ramírez Viñas y Carrasquillo y al tratar hasta el último momento de dar la impresión de que no existía tal convenio de transacción y que las ofertas recibidas por él eran menores de $10,000."

Sobre la reputación profesional del querellado, indica el *Master* que declararon los Lics. Rafael Rivera Zayas, Genaro Cautiño Bruno, Pedro E. Anglade y Celestino Domínguez Rubio. Como resultado de esas declaraciones llega a la conclusión de que "el querellado durante los muchos años que ha ejercido su profesión en Guayama y a través de la Isla de Puerto Rico se ha ganado una buena reputación como profesional honrado y digno de confianza y de que igual reputación goza en la comunidad de Guayama como ciudadano."

Presentado el anterior informe del *Master*, con fecha 26 de marzo del año en curso ordenamos al Secretario de este Tribunal que notificara con copia a las partes y concedimos a éstas un término común de diez días para radicar por escrito sus objeciones al mismo, en caso de tenerlas, de conformidad con lo dispuesto por la Regla 53 (*e*) 2 de las de Enjuiciamiento Civil. En su oportunidad el querellado presentó un pliego de objeciones. En él impugna las conclusiones que aparecen en el informe sobre: (1) el valor de la herencia de Pastor Díaz allá para el 19 de enero de 1940; (2) la participación legal de Díaz Rivera como hijo natural en la herencia de su padre; (3) la incapacidad de Díaz Rivera y conocimiento de la misma por el querellado para la fecha de la transacción; (4) la responsabilidad (sic) de la transacción; y (5) el haber informado el querellado al Lic. Ramírez Viñas que existía una oferta de transacción de $7,500.

Hemos leído esas objeciones. En nuestra opinión carecen de fundamento. También hemos leído detenida y cuidadosamente la totalidad de la transcripción de evidencia y examinados los *exhibits* a ella acompañados. Hemos examinado, asimismo, detenida y serenamente el informe del *Master*. Esa lectura y esos exámenes nos convencen de que ese informe se ajusta a la realidad y de que sus conclusiones están plenamente sostenidas por la prueba.

En esta opinión se hace innecesario, desde luego, determinar si concurriendo un hijo natural reconocido con un hijo legítimo y una viuda, al primero corresponde una sexta o una tercera parte de la herencia de su causante. Ello es inmaterial a los fines del recurso que está ante nos. Sea ello como fuere, la prueba demuestra, sin lugar a dudas, que la transacción se hizo por una suma irrisoria.

Los cargos principales formulados han quedado probados. La conducta del querellado, según la prueba, perjudicó grandemente los intereses de su cliente, persona de inteligencia limitada. De esto último el querellado tenía conocimiento. Huelga repetir los cargos formulados o las conclusiones del *Master*. Tanto los unos como las otras han sido extensamente reseñados y son harto conocidos.

Y la conducta del querellado no sólo resultó perjudicial a su cliente, si que también a sus colegas Carrasquillo Herpén y Ramírez Viñas. La confianza que en él ellos depositaron fué por él quebrantada. Su actuación fué impropia e inmoral, y censurable en extremo. Merece nuestra reprobación.

*Procede, en su consecuencia, que se le separe del ejercicio de su profesión de abogado y notario.*

El Juez Presidente Señor Todd, Jr., no intervino.